| | | |
|---|---|---|
| ERWIN (TOM) ASHWORTH and WILLIAM R. DODSON, | § § § | |
| Plaintiffs, | § § | |
| *versus* | § § | CIVIL ACTION NO. 1:06-CV-494 |
| THE LUBRIZOL CORPORATION, | § § | |
| Defendant. | § § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Lubrizol Corporation's ("Lubrizol") Motion for Summary Judgment (#41). Lubrizol seeks summary judgment on Plaintiffs Erwin (Tom) Ashworth ("Ashworth") and William R. Dodson's ("Dodson") (collectively, "Plaintiffs") claims of negligence arising from the collapse of a scaffold in a tank on Lubrizol's premises. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

I.    <u>Background</u>

On October 2, 2003, Pat Tank, Inc. ("Pat Tank"), a metal storage tank maintenance and repair company, contracted with Lubrizol, a specialty chemicals corporation, to replace the roof and the top shell ring on a chemical storage tank, designated M-39, at Lubrizol's Deer Park facility. At the commencement of the project, Pat Tank workers erected two twelve- to thirteen-foot hanging scaffolds, which were welded to the tank walls—an outside scaffold, which was visible to anyone walking next to the tank, and an inside scaffold, the subject of the collapse, which was affixed to the tank's carbon-steel interior. The record reflects that Lubrizol employees

regularly walked in the immediate vicinity of the tank, peered inside the tank through the manway, and, on occasion, entered the inside of the tank, albeit never with the express purpose of checking the adequacy of Pat Tank's welding or safety procedures.

On October 29, 2003, while working on the project, Pat Tank employees Ashworth and Dodson, both certified welders, were injured when the inside scaffold on which they were working collapsed and fell twelve feet to the bottom of the tank. Dodson, a ten-year employee of Pat Tank, was the foreman of the crew responsible for building the scaffold and welding it into place. Dodson and Sidney Burge, Jr. ("Burge"), another experienced welder, acting at Dodson's direction, constructed and welded the scaffold that failed.

Plaintiffs claim that the safety procedures utilized by Pant Tank needed to be verified and monitored by Lubrizol. Plaintiffs contend that, contrary to industry-recommended safety practices, Pat Tank employees did not "grind" or clean the tank's surface prior to welding the scaffold at issue, did not inspect or "tag" the scaffold before it was used, and did not tie off to an independent anchorage point or "lifeline." Plaintiffs further maintain that, although Lubrizol did not discuss these safety infractions with Pat Tank before the accident, Lubrizol employees took active steps to enforce sound safety practices among Pat Tank employees after the inside scaffold collapsed. Specifically, Raul Villegas ("Villegas"), a Lubrizol maintenance engineer, reportedly asked Pat Tank employees to grind off the rust from tank walls before making welds, to ensure the proper inspection and "tagging" of the scaffolds, and to tie off to lifelines one hundred percent of the time.

On August 18, 2006, Ashworth and Dodson filed their complaint seeking recovery for injuries they sustained as the result of Lubrizol's purportedly negligent exercise of control of the

premises and the work in question. On May 27, 2008, Lubrizol filed a motion for summary judgment, relying on an affirmative defense derived from Chapter 95 of the Texas Civil Practice and Remedies Code. Plaintiffs filed a response, claiming that the facts set forth above overcome the Chapter 95 defense because they demonstrate both of the required elements: first, that Lubrizol either contractually reserved or actually exercised a right of control over the relevant aspects of their work and, second, that Lubrizol employees, before the accident, had actual knowledge of the dangerous conditions which proximately caused their injuries and failed to warn them of the hazard.

II.    Analysis

A.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). Where a defendant moves for summary judgment on

the basis of an affirmative defense and, thus, bears the ultimate burden of persuasion, "it must adduce evidence to support each element of its defenses and demonstrate the lack of any genuine issue of material fact with regard thereto." *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000) (citing *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir.), *cert. denied*, 522 U.S. 915 (1997)); *see Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). To warrant judgment in its favor, the movant "'"must establish beyond peradventure *all* of the essential elements of the defense."'" *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (emphasis in original) (quoting *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (quoting *Fontenot*, 780 F.2d at 1194)).

"A fact is '*material*' if it '*might affect* the outcome of the suit under governing law.'" *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001) (emphasis in original) (quoting *Anderson*, 477 U.S. at 248); *accord Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005); *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan*, 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord EMCASCO Ins. Co. v. American Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006); *Cooper Tire & Rubber Co.*, 423 F.3d at 454; *Harken Exploration Co.*, 261 F.3d at 471. The moving party, however, need not negate the elements of the nonmovants' case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536,

540 (5th Cir. 2005); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3 (quoting FED. R. CIV. P. 56(e)); *Anderson*, 477 U.S. at 256; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11 (1986); *EMCASCO Ins. Co.*, 438 F.3d at 523; *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004); *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587); *see Riverwood Int'l Corp. v. Employers Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005). All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir. 1996); *see Reeves*, 530 U.S. at 150; *Lincoln Gen. Ins. Co.*, 401 F.3d at 350; *Smith*, 391 F.3d at 624; *Malacara*, 353 F.3d at 398; *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003); *Harken Exploration Co.*, 261 F.3d at 471. The evidence of the nonmovants is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in their favor. *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n.5 (1990) (citing *Anderson*, 477 U.S. at 255); *Shields v. Twiss*, 389 F.3d 142, 150 (5th Cir. 2004); *Martin*, 353 F.3d at 412; *Martinez*, 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir.), *cert. denied*, 540 U.S. 815 (2003). The evidence is construed "in favor of the nonmoving party, however, only when an

actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999); *accord Boudreaux*, 402 F.3d at 540; *Little*, 37 F.3d at 1075.

Furthermore, "'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir. 1989)). "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468-69. The nonmovants' burden is not satisfied by "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,'" by speculation, by the mere existence of some alleged factual dispute, or "by only a 'scintilla' of evidence." *Little*, 37 F.3d at 1075 (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994)); *accord Warfield*, 436 F.3d at 557; *Boudreaux*, 402 F.3d at 540. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown*, 337 F.3d at 541; *accord Hugh Symons Group, plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir.), *cert. denied*, 537 U.S. 950 (2002); *see Hockman v. Westward Commc'ns, L.L.C.*, 407 F.3d 317, 332 (5th Cir. 2004); *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003).

Summary judgment is mandated if the nonmovants fail to make a showing sufficient to establish the existence of an element essential to their case on which they bear the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322;

*EMCASCO Ins. Co.*, 438 F.3d at 523; *Cutrera v. Board of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

      B.    <u>Chapter 95 Defense</u>

The relevant law, and the basis for the defendant's motion, is § 95.003 of the Texas Civil Practice and Remedies Code, which provides:

**§ 95.003.  Liability for Acts of Independent Contractors**

A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace unless:

(1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

(2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

Tex. Civ. Prac. & Rem. Code Ann. § 95.003.

Chapter 95 was enacted by the 74th Texas Legislature as part of Senate Bill 28 and adopted as law in 1996 for the purpose of limiting a property owner's liability for deaths or injuries sustained by independent contractors while working on the premises. *See Arsement v. Spinnaker Exploration Co.*, 400 F.3d 238, 245 (5th Cir. 2005); *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 699-700 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Dyall v. Simpson*

*Pasadena Paper Co.*, 152 S.W.3d 688, 699 (Tex. App.—Houston [14th Dist.] 2004, pet. denied).

The statute did not, however, entirely abrogate existing rules regarding premises owner liability.

Rather, the first prong of § 95.003 is a codification of an earlier Texas Supreme Court decision,

adopting the stance taken by the Restatement of Torts regarding premises liability:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

*Redinger v. Living, Inc.* 689 S.W.2d 415, 418 (Tex. 1985) (quoting RESTATEMENT (SECOND) OF

TORTS § 414 (1965)). Indeed, language in § 95.003(1), specifying that the owner's right of

control must be more than "the right to order the work to start or stop or to inspect progress or

receive reports," was adopted verbatim from the Restatement. *See* RESTATEMENT (SECOND) OF

TORTS § 414 at cmt. c. Because § 95.003(1) codifies well-established Texas common law, pre-

1996 Texas independent contractor cases are, therefore, relevant when assessing what degree of

control falls outside the scope of the statute's bar to liability.

 In addition to adopting existing common law, Chapter 95 narrowed a plaintiff's ability to

recover by incorporating a new "actual knowledge" requirement. *Ellwood Tex. Forge Corp.*, 214

S.W.3d at 700; *see Dyall*, 152 S.W.3d at 699. Before Chapter 95 was enacted, Texas common

law required only a showing of "constructive knowledge" on the part of the defendant for liability

to attach. *See id.*; *see also Franks v. Chevron Corp.*, No. 3:06-CV-506, 2007 WL 2330296, at

*7 (S.D. Tex. Aug. 13, 2007). The second prong of § 95.003, however, requires that a plaintiff

adduce evidence that the defendant actually knew of the dangerous condition, not merely evidence

that the defendant should have known about it, in order to overcome the statutory protection

provided by Chapter 95.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2).  "In other words,

the burden now rests upon the plaintiff to show both (1) control *and* (2) actual knowledge of the

danger.  These are two independent and necessary conditions to the imposition of liability."

*Dyall*, 152 S.W.3d at 699 (emphasis in original).  As the United States Court of Appeals for the

Fifth Circuit explained:

> As does the common law, Chapter 95 provides that property owners are not liable
> for injuries to employees of independent contractors working on the owner's real
> property, or improvements to it, unless, first the property owner exercises "control
> over the manner in which the work is performed."  Chapter 95 narrows the
> property owner's duty to an independent contractor, however, by further protecting
> the owner from liability unless he:  second, has "*actual knowledge of the danger*
> . . . resulting in the personal injury*"; and third, "fails to *adequately warn*" of that
> danger.

*Arsement*, 400 F.3d at 245 (emphasis in original) (internal citations omitted).  "An owner may

be aware of the danger, but exercise no control, or he may exercise control and have no actual

knowledge of the danger; in either instance, the owner is statutorily shielded from liability."

*Ellwood Tex. Forge Corp.*, 214 S.W.3d at 700; *accord Moreno v. BP Am. Prod. Co.*, No. 04-08-

00036, 2008 WL 4172248, at *2 (Tex. App.—San Antonio, Sept. 10, 2008, no pet. h.); *Dyall*,

152 S.W.3d at 699.

      1.      <u>Applicability of Chapter 95</u>

Section 95.002 of Chapter 95 contains the following provision regarding the statute's

applicability:

**§ 95.002.  Applicability**

This chapter applies only to a claim:

> (1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and

> (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.002. Thus, two requirements must be met before an injured employee's civil suit for damages falls within the parameters of Chapter 95. First, the suit must be brought by and against a party specified in § 95.002(1); second, the claim must "arise from" an activity involving a modification or improvement to the property. *See Williamson v. Paccar, Inc.*, No. 4:06-CV-282, 2007 WL 2264720, at *3 (E.D. Tex. Aug. 6, 2007); *Vanderbeek v. San Jacinto Methodist Hosp.*, 246 S.W.3d 346, 350 (Tex. App.—Houston [14 Dist.] 2008, no pet. h.); *Phillips v. The Dow Chem. Co.*, 186 S.W.3d 121, 131 (Tex. App.—Houston [14 Dist.] 2005, no pet.).

When interpreting the first prong of § 95.002, courts have held that Chapter 95 applies both to property owners "and also to their agents who oversee their properties." *Fisher v. Lee & Chang P'ship*, 16 S.W.3d 198, 203 (Tex. App.—Houston [1st Dist.] 2000, pet. denied); *accord Jones v. Apache Corp.*, No. G-05-499, 2007 WL 656268, at *4 (S.D. Tex. Feb. 27, 2007). "Property owner," as defined in Chapter 95, is "a person or entity that owns real property primarily used for commercial or business purposes." TEX. CIV. PRAC. & REM. CODE ANN. § 95.001(3). The term "agent" has been used loosely by the courts and may, depending upon the specifics of the case, pertain to any person or entity "act[ing] on behalf of the owner in carrying out any duties required under the law." *Berry Prop. Mgmt., Inc. v. Bliskey*, 850 S.W.2d 644, 658 (Tex. App.—Corpus Christi 1993, writ dism'd by agr.); *see Fisher*, 16 S.W.3d at 203.

10

The second prong of § 95.002 requires that the claim arise from an activity involving a repair or a modification to real property. TEX. CIV. PRAC. & REM. CODE ANN. § 95.002(2). This portion of the statute is satisfied so long as the contractor or subcontractor makes a modification, renovation, repair, or refurbishment to any permanent structure attached to the land. *See Francis v. Coastal Oil & Gas Co.*, 130 S.W.3d 76, 85 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *see also Sonnier v. Chisholm-Ryder Co., Inc.*, 909 S.W.2d 475, 479 (Tex. 1995) ("An improvement includes all additions to the freehold except for trade fixtures which can be removed without injury to the property."). Structures potentially within the scope of the statute encompass a variety of shapes, sizes, and functions. *See, e.g.*, *Phillips*, 186 S.W.3d at 132 (scaffolding); *Francis*, 130 S.W.3d at 85 (mineral wells); *Fisher*, 16 S.W.3d at 201 (roof-mounted air conditioning units).

In the instant case, Lubrizol's ownership of the Deer Park facility and the M-39 tank is undisputed. Hence, Lubrizol qualifies a "property owner" within the meaning of the statute. Further, Plaintiffs Ashworth and Dodson were indisputably employees of a contractor, Pat Tank, when they were injured. Moreover, because it is uncontested that Pat Tank was "constructing, repairing, renovating, and/or modifying" the M-39 tank structure when the accident occurred, the claim clearly "arises from the condition or use of an improvement to real property" within the meaning of the statute. Accordingly, § 95.003 applies to the case at bar.

2.    <u>Chapter 95 Burden of Production</u>

The defense has the initial burden of establishing that Chapter 95 applies to the case. *Rueda v. Paschal*, 178 S.W.3d 107, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *see also Jones*, 2007 WL 656268, at *2; *Moreno*, 2008 WL 4172248, at *2. Once it is shown that

11

Chapter 95 applies, however, the burden shifts to the plaintiff to demonstrate the applicability of § 95.003. *Rueda*, 178 S.W.3d at 111. Specifically, in order to prevail against a defendant's motion for summary judgment, the plaintiff must show: (1) that the defendant had control over the dangerous condition which caused the injury; and (2) that the defendant had actual knowledge of that condition and failed to warn him adequately about the danger. *Phillips*, 186 S.W.3d at 133 ("the plaintiff has to present evidence demonstrating triable issues of fact concerning both required elements of section 95.003 to overcome [the] statute's general rule of nonliability" upon a defendant's motion for summary judgment); *see Ellwood Tex. Forge Corp.*, 214 S.W.3d at 700; *Rueda*, 178 S.W.3d at 110; *Dyall*, 152 S.W.3d at 699; *Kelly v. LIN Television of Tex., L.P.*, 27 S.W.3d 564, 567 (Tex. App.—Eastland 2000, pet. struck); *Fisher*, 16 S.W.3d at 203.

    C.    <u>Control Under § 95.003(1)</u>

    The standard for evaluating an owner or employer's degree of control over an independent contractor's work was well-established by Texas common law before § 95.003(1) was enacted. *See Tirres v. El Paso Sand Prod., Inc.*, 808 S.W.2d 672, 676 (Tex. App.—El Paso 1991, writ denied) (collecting cases). The requirements are clear: to penetrate the shield of non-liability, the premises owner's control must extend to the "means, methods, or details" of the independent contractor's work to such an extent that "'the contractor is not entirely free to do the work in his own way.'" *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999) (quoting RESTATEMENT (SECOND) OF TORTS § 414 at cmt. c); *accord Moreno*, 2008 WL 4172248, at *3; *Ellwood Tex. Forge*, 214 S.W.3d at 700; *Gaspard v. DuPont Dow Elastomers, L.L.C.*, 140 S.W.3d 415, 419 (Tex. App.—Beaumont 2004, no pet.). A general right to order work to start or stop, to inspect progress and receive reports, to make suggestions or recommendations that need not necessarily

be followed, or to prescribe alterations and deviations does not trigger liability. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 356 (Tex. 1998) (quoting RESTATEMENT (SECOND) OF TORTS § 414 at cmt. c); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(1); *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002); *Vanderbeek*, 246 S.W.3d at 351; *Bartee v. Baylor Coll. of Med.*, No. 14-06-00324-CV, 2007 WL 2989614, at *3 (Tex. App.—Houston [14th Dist.] Oct. 16, 2007, no pet.). The premises owner's control must also relate to the activity that actually caused the injury. *Arsement*, 400 F.3d at 252; *Elliott-Williams Co.*, 9 S.W.3d at 804; *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999); *Ellwood Tex. Forge Corp.*, 214 S.W.3d at 700.

Texas common law recognizes two theories for establishing a property owner's control over the "means, methods, or details" of an independent contractor's work—control can be demonstrated either by an express contractual provision granting the power of control to the owner or by inference from the property owner's actual exercise of control. *General Elec. Co. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008); *Bright*, 89 S.W.3d at 606; *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999); *Coastal Marine Serv. of Tex., Inc.*, 988 S.W.2d at 226; *Vanderbeek*, 246 S.W.3d at 352; *Ellwood Tex. Forge*, 214 S.W.3d at 700; *Chi Energy, Inc. v. Urias*, 156 S.W.3d 873, 879 (Tex. App.—El Paso 2005, pet. denied); *see also Williamson*, 2007 WL 2264720, at *2. The owner's failure actually to exercise control over a contractor's activities will not shield him from liability if he expressly retains a contractual right to do so. *Elliott-Williams Co.*, 9 S.W.3d at 804; *accord Bright*, 89 S.W.3d at 606.

D.    Contractual Control

The existence of contractual control is traditionally a question of law for the court to resolve. *Bright*, 89 S.W.3d at 606; *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 783 (Tex. 2001); *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 720 (Tex. App.—Fort Worth 2006, no pet.); *EPGT Tex. Pipeline, L.P. v. Harris County Flood Control Dist.*, 176 S.W.3d 330, 336 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd). As a general rule, under Texas law, a property owner does not have contractual control over the "means, methods, or details" of an independent contractor's work absent an express contractual provision granting such right of control. *See*, *e.g.*, *Bright*, 89 S.W.3d at 606-07; *Koch Ref. Co.*, 11 S.W.3d at 156; *Bunker v. Landstar Ligon, Inc.*, 136 S.W.3d 372, 375 (Tex. App.—Corpus Christi 2004, no pet.). A contract is commonly defined as "an agreement between two or more parties that creates an obligation to do or not to do a particular thing." *Frady v. May*, 23 S.W.3d 558, 565 (Tex. App.—Fort Worth 2000, no pet.) (citing BLACK'S LAW DICTIONARY 322 (6th ed. 1990)). As a prerequisite for a valid contract, each of the parties must intend to enter into a mutually binding agreement. *Cox v. Southern Garrett, L.L.C.*, 245 S.W.3d 574, 579 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Brown v. Sabre, Inc.*, 173 S.W.3d 581, 588 (Tex. App.—Fort Worth 2005, no pet.); *Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 24 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Further, to constitute a valid contract, "[t]he parties must agree to the same thing, in the same sense, at the same time." *Angelou v. African Overseas Union*, 33 S.W.3d 269, 279 (Tex. App.—Houston [14th Dist.] 2000, no pet.). "To create an enforceable contract, the minds of the parties must meet with respect to the subject matter of the agreement and all its essential terms." *Weynard v. Weynard*, 990 S.W.2d 843 (Tex. App.—Dallas 1999, pet. denied). Thus, given the

consensual nature of a contract, the court must discount Plaintiffs' creative, albeit legally unsound, argument that Lubrizol retained the right to control the details of Pat Tank's work "through its internal corporate structure." Because a contract is an agreement between *different* parties, no amount of internal corporate documentation, meetings, faxes, e-mails, office memoranda, phone calls, or voice mails exchanged among agents of the *same* party can ever result in a bilateral, contractual agreement.

A review of the record reflects that two documents—the Access Agreement and the Purchase Order—comprise the contractual agreement in this case. Both were signed by Wiley C. Butler, Lubrizol Purchasing Manager, and David Hitt ("Hitt"), Pat Tank Vice President, are dated October 8, 2002, and took effect on January 1, 2003. The court rejects Plaintiffs' contention that the Access Agreement is not part of the contract because the Access Agreement and the Purchase Order do not refer to each other. The first paragraph of the Access Agreement expressly incorporates the Purchase Order by reference. Moreover, the court is not aware of, and Plaintiffs fail to identify, any legal rule or authority indicating that a contract cannot consist of multiple documents unless those documents explicitly mention each other. Both the Access Agreement and the Purchase Order were signed by the same persons on behalf of Lubrizol and Pat Tank at approximately the same time. Hence, there is no logical reason to believe that one document constitutes part of the parties' contract while the other does not. Moreover, the Access Agreement is said to apply to "any and all" of Pat Tank's projects on Lubrizol's premises through December 31, 2013; therefore, it was in effect at the time of the incident in question. The parties' intent appears to be clear from the face of the document as well as the overall context, and Plaintiffs have presented no sound reason to exclude the Access Agreement from the contract.

The Access Agreement contains no express contractual provision giving Lubrizol a right of control over Pat Tank. In fact, the document contains language that grants Pat Tank, the "Permittee," sole responsibility for its own work, equipment, and safety methods. Of particular importance is Paragraph 5, which states:

> **RESPONSIBILITY**. All of the work or other activity to be performed or engaged in by the Permittee and the Permittee's subcontractors on the Premises is and shall be as independent contractors. The Permittee shall (and cause each of Permittee's subcontractors to) completely acquaint itself with and observe all of the safety rules and requirements in effect at the Premises and shall provide all safeguards and shall take all necessary measures and precautions, taking into account the nature of the work or other activities to be performed or engaged in, to prevent the occurrence of any accident, injury, death, damage or loss to any person or property at the Premises.

The language of Paragraph 8 further defines the scope of Pat Tank's responsibility vis-a-vis Lubrizol:

> **RESPONSIBILITY FOR MACHINERY, EQUIPMENT, MATERIALS AND SUPPLIES**. Permittee shall retain control of and be solely responsible for any property (including, without limitation, machinery, equipment, materials, and supplies) brought onto the Premises by or on behalf of Permittee or Permittee's subcontractors (Permittee's Property"). Permittee's responsibiilty as to Permittee's Property shall include (i) ensuring that only fully trained and otherwise qualified personnel operate the machinery and equipment within the parameters of use for which it was intended, (ii) paying or otherwise satisfying any and all claims for damages or other relief arising out of or in connection with the transportation, handling, use, operation, storage, maintenance, safeguarding and protection of such property, and (iii) subject to Section 6 hereof, indemnifying and saving harmless Lubrizol, it officers, employees, and agents against all Claims arising out of or in connection with Permittee's Property. Permittee's responsibilities with respect to such property as set forth in this Section 8 shall continue until the property is removed from the Premises or, with respect to such property as is incorporated into the work, until the work is accepted by Lubrizol.

These provisions refute the notion that Lubrizol reserved the right to control the details of Pat Tank's work. Indeed, the Texas Supreme Court has held that language similar to that set forth

in Paragraph 5 precludes the existence of contractual control. *See Bright*, 89 S.W.3d at 606-07.

Accordingly, the court is of the opinion that the Access Agreement does not give Lubrizol a contractual right to control the means, methods, or details of Pat Tank's work.

Turning to the Purchase Order, Plaintiffs argue that Paragraph 12 of the original document and Paragraph 4 of the Supplementary Terms and Conditions are "broad 'trump-card' provisions," which give Lubrizol, as "Buyer," "an unlimited, unilateral right" to alter the terms of the contract with Pat Tank, the "Seller." The language in question states:

> 12. **CHANGES:** BUYER may at any time, by written notice, make changes in the terms of this Contract or the goods or services provided hereunder, and SELLER shall comply therewith. If any such change causes an increase or decrease in the cost of or time required for performance of SELLER'S obligations pursuant to this Contract, an equitable adjustment shall be made in the price or delivery schedule or both, and this Contract shall be modified in writing accordingly. Any claim by the SELLER for adjustment under this clause must be made within fifteen (15) days from the date of receipt by SELLER of notification of the change.
>
> * * *
>
> 4. **Changes, Alterations and Modifications.** BUYER may at any time by a written order and without notice to SELLER's sureties or assigns change the extent of the work covered by this Contract, the specifications or other description herein, or the time of completion. In connection with any such written order, BUYER may issue a written stop work order with which SELLER shall fully comply, and SELLER shall be excused from proceeding with the work as changed only so long as such stop work order remains in effect. Promptly upon receipt of the details of any such change, SELLER shall either advise that the change will not affect its costs, or furnish: (1) a breakdown of estimated cost and changes in the price attributable thereto, and (2) a statement of any necessary changes in the time of completion. SELLER's failure to advise BUYER within ten (10) days of the effect of any change hereunder shall constitute SELLER's consent to conform to the change without increase in the price, or without change in other terms and conditions of this Contract. The "written order" authorized by this article shall be effective notwithstanding the absence of SELLER's formal acceptance thereof. If the change causes a material increase or decrease in costs, then an equitable adjustment of the price herein to be paid to SELLER shall promptly be negotiated by BUYER and SELLER and incorporated in an amendment to this Contract.

The court finds Plaintiffs' assertion that these provisions give Lubrizol contractual control over the "means, methods, or details" of Pat Tank's work belied by the fact that the referenced paragraphs appear to be nothing more than standard "changes" clauses. Clauses similar to those quoted above are commonly found in construction and repair contracts. *See generally* BRUNER & O'CONNOR ON CONSTRUCTION LAW § 4:2 (2008). The California Supreme Court succinctly described and discussed the purpose of such clauses a century ago:

> It is always a wise precaution . . . to insert provisions to control the case of extra work which may appear to be necessary or desirable while the construction is going on. . . . No prudent individual would make a contract for the construction of a building of any magnitude without incorporating a provision somewhere making specific and definite arrangements concerning extra work.

*City St. Improvement Co. v. Kroh*, 158 Cal. 308, 321 (Cal. 1910) (internal quotations omitted), *overruled in part by City of Pasadena v. Charleville*, 215 Cal. 384 (Cal. 1932). In reality, projects are not always completed in conformity with the original plans. If a contract lacks an arrangement concerning extra work, then the independent contractor, having already entered into a presumably profitable agreement, has little incentive to alter its performance to meet the owner's new specifications. A "changes" clause merely provides the owner a way to deal with unforseen contingencies that may arise in the course of the project. *See* BRUNER & O'CONNOR § 4:2.

Plaintiffs' contention that Lubrizol had "unlimited" power to modify the contract under the above clauses is, likewise, inaccurate. The United States Supreme Court has long held that the application of clauses granting one party the power to alter a contract's original terms should be limited to what was "fairly and reasonably within the contemplation of the parties when the contract was entered into." *Freund v. United States*, 260 U.S. 60, 63 (1922) (citing *United States v. Utah, Nev., & N.C. Stage Co.*, 199 U.S. 414 (1905); *Hunt v. United States*, 257 U.S. 125

(1921)); *see* BRUNER & O'CONNOR § 4:2. Thus, even under Plaintiffs' view that "changes" clauses relate in some manner to Chapter 95 control, any control reserved by Lubrizol with these provisions would be limited to what the parties reasonably contemplated at the time the contract was executed. *See Freund*, 260 U.S. at 63.

Under Texas law, standard changes clauses do not vest the type of control contemplated by Chapter 95, which requires control over the "means, methods, or details" of an independent contractor's work to a degree that renders the contractor "'not entirely free to perform the work in his own way.'" *See Elliott-Williams Co.*, 9 S.W.3d at 804 (quoting RESTATEMENT (SECOND) OF TORTS § 414 at cmt. c). The purpose of Paragraph 4 of the Purchase Order and Paragraph 12 of the Supplementary Terms and Conditions is to give Lubrizol the ability to alter the parameters of the final product—which would involve either adding to or subtracting from the scope of work within reasonably anticipated limits. Notwithstanding this ability to modify the final product, nowhere within the Purchase Order or its supplement is Lubrizol given the power to control the "means, methods, or details" of Pat Tank's work. Put simply, while Lubrizol can tell Pat Tank *what* it wants done, neither Paragraph 4 nor Paragraph 12 allows Lubrizol to tell Pat Tank *how* to complete the task.

With regard to Chapter 95, the Purchase Order grants Lubrizol, at most, the power to bring work to a standstill pending a re-negotiation of fees and/or the estimated time of completion. Such power, by definition, does not extend beyond "the right to order the work to start or stop," and is, therefore, insufficient to pierce Chapter 95's protective shield. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003; *see also Elliott-Williams Co.*, 9 S.W.3d at 804 (quoting RESTATEMENT (SECOND) OF TORTS § 414 at cmt. c) ("'It is not enough that [the employer] has

merely a general right to . . . make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers . . . .'"); *Mendez*, 967 S.W.2d at 356. Because the rules regarding the purpose and scope of contractual changes clauses are well-established and lie within a relatively distinct sphere of law, the court sees no reason to entangle them with Chapter 95 jurisprudence by holding that these provisions grant Lubrizol the type of contractual control envisioned by the statute.

E.     Actual Control

It is apparent from the record that Lubrizol never exerted actual control over the "means, methods, or details" of Pat Tank's work. At deposition, Dodson testified at length on this subject:

Q:     . . . Did you discuss with anyone from Lubrizol where you planned to weld your scaffold to the wall of the tank?
A:     Where exactly we was going to weld them?
Q:     Yes.
A:     No.
Q:     Did you discuss with anyone from Lubrizol how you planned to erect your scaffold?
A:     Yes, sir.
Q:     Who did you talk to about that?
A:     Raul Villegas.
Q:     Did you – did Mr. Villegas give you any specific instructions as to how to build your scaffold?
A:     No, not detailed instructions, no.
Q:     Did you feel like you were able to make your – you were free to make the decisions you needed to make in order to do your job in erecting that scaffold?
A:     Yes, sir.
Q:     Did you feel like you were free to choose whatever methods you needed to use to safely build your scaffold?
A:     Yes, sir.
Q:     Okay. And did you have the means at your disposal to build your scaffold the way you believed it needed to be built?
A:     Yes, sir.
Q:     In other words, Lubrizol didn't prevent you from doing something that you felt you needed to do in order to safely build your scaffold: is that right?

A:    No, sir.
Q:    Did Mr. Villegas or anybody from Lubrizol tell you how to do the welding on the scaffold?
A:    No.
Q:    Did they tell you whether or not to grind the metal, to clean the metal of the tank off before doing the – the welding?
A:    Did they tell me to grind it?
Q:    Or did they tell you not to, either one?
A:    They didn't tell me either way.

Plaintiffs, however, advance four distinct theories in support of their contention that Lubrizol wielded actual control over Pat Tank. First, Plaintiffs argue that, by virtue of its ownership of the M-39 tank, Lubrizol had actual control over the bottom two rings of the structure, the area of the tank where the scaffolding was affixed. Second, Plaintiffs assert that Lubrizol controlled Pat Tank's work because Pat Tank employees would have followed Lubrizol's instructions had Lubrizol decided to exercise control before the accident. Third, Plaintiffs contend that Lubrizol exerted actual control over Pat Tank's welding procedures because Lubrizol failed to give Pat Tank permission to grind on the tank wall prior to welding. Finally, Plaintiffs claim that Lubrizol's exercise of actual control can be inferred from its post-accident suggestions regarding safety procedures.

### 1.    Control Over Bottom Two Rings

In an effort to establish actual control, Plaintiffs point to "a universal principle of law that the right of property carries with it the right to control." *April Sound Mgmt. v. Concerned Prop. Owners for April Sound, Inc.*, 153 S.W.3d 519, 525 (Tex. App.—Amarillo 2004, no pet.). This overarching principle, while perhaps generally accurate, does not address the type of control contemplated by Chapter 95—control over the "means, methods, or details" of an independent contractor's work. As one federal court explained, "[t]he clear language of Section 95.003(1)

21

indicates that the property owner must retain control over the plaintiff's *work*, not the object or improvement causing the alleged injury, in order to be held liable." *Williamson*, 2007 WL 2264720, at \*4 (emphasis in original). Moreover, it is undisputed that Pat Tank owned the scaffold that collapsed, the brackets and clips, and the welding materials and equipment utilized by Plaintiffs. The court, therefore, finds Plaintiffs' first argument inapposite and holds that Lubrizol did not exercise sufficient control over Pat Tank's work as required to impose liability under Chapter 95 merely by virtue of its ownership of the tank's bottom two rings.

### 2.     Control Inferred Through Possibility of Control

Plaintiffs also urge that Lubrizol exerted the requisite right of control over Pat Tank's work because Lubrizol employees "could have" given Pat Tank employees instructions before the accident. In support of this argument, Plaintiffs present excerpts from the depositions of Hitt and Burge suggesting that Lubrizol's instructions would probably have been followed had they been given. The law on the subject, however, is abundantly clear that "[i]t is not enough that the independent contractor's employees would have taken direction . . . if any had been offered." *Gaspard*, 140 S.W.3d at 419; *see also Koch Ref. Co.*, 11 S.W.3d at 156; *Ellwood Tex. Forge Corp.*, 214 S.W.3d at 701. As the Texas Supreme Court has plainly stated, "[a] possibility of control is not evidence of a 'right to control' actually retained or exercised" within the Chapter 95 framework. *Coastal Marine Serv. of Tex., Inc.*, 988 S.W.2d at 226; *accord EPGT Tex. Pipeline, L.P.*, 176 S.W.3d at 336; *Cherqui v. Westheimer St. Festival Corp.*, 116 S.W.3d 337, 347 (Tex. App.—Houston [14 Dist.] 2003, no pet.). Accordingly, any attempt to demonstrate actual control by showing only a potential for such control is unavailing.

22

### 3. Failure to Grant Permission to Grind

Plaintiffs further assert that Lubrizol exercised control over Pat Tank by failing to grant its employees permission to grind on the wall of the tank in order to remove corrosion from the weld sites prior to erecting the scaffolding. The record reflects, however, that Pat Tank employees never sought such permission from Lubrizol. As Dodson testified:

> Q: . . . Did you ask [Lubrizol] if you could grind the metal at all to do – before you did your welds?
> A: No, sir.

Additionally, there is no indication that Lubrizol had an affirmative duty to mandate that Pat Tank employees seek Lubrizol's permission to follow welding safety guidelines. In fact, "[i]n Texas, the general rule is that an owner . . . has no duty to see that an independent contractor performs work in a safe manner." *Ellwood Tex. Forge Corp.*, 214 S.W.3d at 698 (citing *Abalos v. Oil Dev. Co. of Tex.*, 544 S.W.2d 627, 631 (Tex. 1976)); *see also Elliot-Williams Co., Inc.*, 9 S.W.3d at 803; *McCaughtry v. Barwood Homes Ass'n*, 981 S.W.2d 325, 330 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Moreover, Paragraph 5 of the Access Agreement specifically vests in Pat Tank the responsibility for observing all safety rules and taking all safeguards and precautions necessary to prevent injury at the job site.

Nevertheless, a duty analysis is unnecessary here—Plaintiffs' argument is without basis because permission to grind on the tank wall was, in this instance, implied within the scope of Lubrizol and Pat Tank's contractual agreement. Under the circumstances of the present case, it is illogical to contend that Pat Tank, while having Lubrizol's permission to weld scaffolding to the M-39 tank, somehow lacked permission to clean the surface of the tank prior to the welding. If grinding the surface of the tank was a relevant safety practice, then Pat Tank had both

permission and the responsibility to implement such practice under Paragraph 5 of the Access Agreement before proceeding with welding the scaffolding to the tank.

Moreover, if Pat Tank employees were viewed as needing Lubrizol's permission to grind on the tank's surface before meeting their contractual obligations, then such permission would have fallen within the scope of Lubrizol's implied duty of cooperation. "American jurisprudence implies in all contracts and upon all parties the obligation to cooperate with each other in the performance of the contract and not to delay, hinder, or interfere with the performance of the parties." BRUNER & O'CONNOR § 9:99 (citing *Gulf, M&O R. Co. v. Illinois Cent. R. Co.*, 128 F. Supp. 311, 324 (N.D. Ala. 1954), *aff'd*, 225 F.2d 816 (5th Cir. 1955) ("A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove.")) An owner, therefore, is implicitly assumed to grant a contractor at least such access, permits, and materials as are reasonably necessary for adequate performance under the contract. In fact, "[a] contractor is excused from performance when the owner fails to provide the required means to complete the contract." *CDS Enters., Inc. v. Myraad Real Estate, Inc.*, No. 14-97-00197-CV, 1999 WL 548226, at *5 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (citing *Sage St. Assocs. v. Northdale Constr. Co.*, 809 S.W.2d 775, 777 (Tex. App.—Houston [14th Dist.] 1991), *aff'd in part and remanded in part on other grounds*, 863 S.W.2d 438 (1993)); *see also Dorsett v. Cross*, 106 S.W.3d 213, 217-18 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("When a contract has been substantially performed and an attempt to complete performance is refused, the refusal excuses any further attempt to perform by the party offering performance and entitles that party to recover under the contract.").

In the present case, all necessary access and means to perform were granted to Pat Tank, both implicitly and explicitly, through the language of the Access Agreement. Therefore, the only situation in which the failure of Pat Tank's employees to secure independent permission to grind on the tank's surface would be significant is if Lubrizol took affirmative action to deny Pat Tank the ability to clean the welding surfaces. Because there is no evidence that Lubrizol employees interfered with Pat Tank's welding procedures before the accident, whether by denying permission to clean the weld sites or otherwise, the court finds Plaintiffs' argument to be without merit.

### 4.    Post-Accident Control Over Safety Procedures

Plaintiffs' final contention is that Lubrizol's alleged post-accident control over the implementation of new safety procedures raises a genuine issue of material fact as to Lubrizol's right to control safety procedures before the accident. A property owner normally has the right to make non-binding recommendations and suggestions to a contractor without raising the specter of liability. *See Elliott-Williams Co.*, 9 S.W.3d at 804 (citing RESTATEMENT (SECOND) OF TORTS § 414 at cmt. c); *Mendez*, 967 S.W.2d at 356; *see also Moreno*, 2008 WL 4172248, at *3 ("[I]t is not enough to recommend a safe manner for the independent contractor's employees to perform the work."). Plaintiffs contend, however, that an owner's post-accident measures imposing new safety procedures on an independent contractor are "some evidence" of Chapter 95 control. In the case at bar, Plaintiffs allege that, after the accident, Lubrizol employees, particularly Villegas, asked Pat Tank employees to replace the scaffolding, making sure that the surface at the weld sites was clean and shiny before the welds were made; verify the safety of the new scaffolds; and use proper fall protection. It is unclear from the record, however, whether Lubrizol's requests were

mandatory directives or merely advisory suggestions, and an assumption in that regard would be entirely speculative.

Even if the court inferred that Lubrizol required, rather than merely encouraged, the implementation of new safety procedures, the court is still unable to accept Plaintiffs' implication that, by promulgating safety standards after the accident, Lubrizol exercised actual control over Pat Tank employees at the time of the accident. Texas law clearly provides that "employers can set minimal safety standards without incurring liability." *Dyall*, 152 S.W.3d at 702 (citing *Mendez*, 967 S.W.2d at 358); *see also Bartee*, 2007 WL 2989614, at *4; *Ellwood Tex. Forge Corp.*, 214 S.W.3d at 702 ("The Supreme Court has established that a premises owner, by requiring an independent contractor to follow its safety rules and regulations, does not owe the independent contractor's employee a duty to ensure that the employee does nothing unsafe. . . ."). Similarly, a premises owner generally cannot be found liable simply because it requires its contractors to comply with applicable laws and safety regulations. *See Mendez*, 967 S.W.2d at 357 (collecting cases). Further, actual control is not demonstrated when an owner implements a safe work permit system, places safety workers at a site, or retains the right to forbid work from being performed in a dangerous manner or to stop work due to safety violations or concerns. *See Ellwood Tex. Forge Corp.*, 214 S.W.3d at 702; *Phillips*, 186 S.W.3d at 135. As the *Dyall* court reasoned, "it would be harmful to worker safety and, thus, to public policy, to hold that control over 'safety matters' subjects an owner to liability because such a holding would encourage owners to divorce themselves from all safety concerns." 152 S.W.3d at 700.

Texas courts have recognized two exceptions to the general rule that excludes control over safety procedures from the scope of § 95.003(1). The first exception is apparent from the rule

itself—an owner may be held liable if the safety regulations it imposes actually increase the risk or severity of the plaintiff's injuries. *Ellwood Tex. Forge Corp.*, 214 S.W.3d at 702 (citing *Mendez*, 967 S.W.2d at 357-58). "Unless the owner's 'safety' regulation unwisely imperils the contractor, its imposition and observance must be encouraged, not discouraged, and cannot reasonably be considered the type of control the legislature envisioned as coming within the ambit of the statute." *Dyall*, 152 S.W.3d at 700. The second exception permits the imposition of liability if an owner usurps *all* safety responsibilities for the project. In *Lee Lewis Constr., Inc.*, a Texas appellate court explained this exception, stating:

> as the general contractor increases its authority over matters of safety, its duty to act with reasonable care similarly increases. . . . Conceivably, if all of the subcontractor's independence in the area of safety were usurped then the general contractor's duty of care would consist of more than merely assuring that its rules do not increase the risk of harm. Indeed, if the area of safety is usurped, then the general contractor would have to exercise reasonable care by not only assuring that its rules do not increase the risk of harm, but also affirmatively promulgating rules which ameliorate unsafe practices or conditions of which it knew or should have known.

64 S.W.3d 1, 7 (Tex. App.—Amarillo 1999), *aff'd*, 70 S.W.3d 778 (2001).

Neither exception applies in the instant case: Plaintiffs do not claim that they were injured by Lubrizol's suggested safety procedures, nor is there evidence that Lubrizol usurped *all* responsibility in the area of safety. In fact, Plaintiffs complain of the exact opposite—that Lubrizol did not exert sufficient authority over safety matters prior to the accident. Therefore, the court must reject Plaintiffs' argument that Lubrizol's post-accident safety measures show that the property owner had actual control over the "means, methods, or details" of Pat Tank's work at the time Plaintiffs sustained their injuries.

Plaintiffs have not demonstrated that Lubrizol either reserved the right to control Pat Tank's work pursuant to the contract between the parties or that Lubrizol exercised actual control over Pat Tank employees. Thus, Plaintiffs have failed to meet their burden to establish the type of control necessary for the imposition of premises liability in the instant case.

F.      Knowledge Under § 95.003(2)

Chapter 95 mandates that the owner have actual knowledge of the dangerous condition resulting in personal injury, death, or damage for liability to arise. TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2). Knowledge that an activity is potentially dangerous is not sufficient to meet this requirement. *Dyall*, 152 S.W.3d at 707 n.18 (citing *Bishop v. Nabisco, Inc.*, No. 14-03-00639-CV, 2004 WL 832916, at *3 (Tex. App.—Houston [14th Dist.] 2004, no pet.)); *accord Williamson*, 2007 WL 2264720, at *5. Proof of constructive knowledge is likewise inadequate to satisfy the statute. *Ellwood Tex. Forge Corp.*, 214 S.W.3d at 700; *Dyall*, 152 S.W.3d at 699; *see also Phillips*, 186 S.W.3d at 133 (finding that § 95.003(2) elevated the common law "should have known" test to an "actual knowledge" requirement). Similarly, proof of negligent failure to inspect is no substitute for actual knowledge. *Kelly*, 27 S.W.3d at 572-73. Hence, "knowledge of the dangerous condition" within the meaning of the statute requires that the observer actually know that the condition is dangerous. *Rueda*, 178 S.W.3d at 110-111. Additionally, the dangerous condition known to the defendant must be the same dangerous condition that proximately caused the injury or damage at issue. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2); *Brocken v. Entergy Gulf States, Inc.*, 197 S.W.3d 429, 439 (Tex. App.—Beaumont 2006, no pet.). Finally, an owner who has actual knowledge of the relevant dangerous condition

can still invoke the protection of Chapter 95 if he adequately warns the contractor of the danger. *See* Tex. Civ. Prac. & Rem. Code Ann. § 95.003(2); *Jones*, 2007 WL 656268, at *3.

G.    Actual Knowledge

Even if Plaintiffs had raised a fact issue regarding the control requirement, Lubrizol argues that Plaintiffs have failed to demonstrate that it had actual knowledge of a dangerous condition on the job site prior to the accident.  In this instance, before assessing whether Lubrizol had "actual knowledge of a dangerous condition," the relevant condition that proximately caused the injury must be identified.  *James v. Cousins Prop., Tex., L.P.*, No. 03-06-00617, 2008 WL 2220016, at *2 (Tex. App.—Austin May 30, 2008, no pet.); *see also Brocken*, 197 S.W.3d at 439-40. Plaintiffs contend that the relevant dangerous conditions were:  (1) the lack of proper grinding of the weld sites on the inside of the tank; (2) the lack of inspection and "tagging" of the scaffolding; and (3) the lack of independent fall protection.  Lubrizol argues that the only relevant dangerous condition was the inadequacy of the welds attaching the scaffolding to the inside of the tank. Lubrizol also points out that Plaintiffs have offered no evidence that the other conditions cited by Plaintiffs were a proximate cause of the incident at issue.

To impose liability on a property owner, Texas courts have consistently required the production of evidence of the owner's actual knowledge of the dangerous condition that caused the injury in question.  For example, in *James*, an independent contractor's employee was injured when a portable toilet in which he was enclosed rolled off a loading dock.  2008 WL 2220016, at *1.  Although the property owner knew that mobile toilets were being placed on the sidewalk near the loading dock, the court granted summary judgment in favor of the owner, finding no evidence that the premises owner had actual knowledge that the toilet's wheels were unlocked

when it was placed on the dock. 2008 WL 2220016, at *3. Similarly, in *Rueda*, a worker was injured when a ladder being used to access the basement of a house slipped. 178 S.W.3d at 108. The court rejected the plaintiff's argument that because the premises owners knew that a ladder was being used, they had actual knowledge of a dangerous condition that caused the ladder to slip. *Id.* at 109-10. Likewise, in *Brocken*, a bucket truck was accidentally electrified while a crew was moving an electric line to a new pole, and a lineman fractured his ankle when jumping from the top of the truck to the ground. 197 S.W.3d at 432. The court granted summary judgment for the property owner, as there was no proof that the owner had actual knowledge that the crew moving an electrical line incorrectly expected a device known as a recloser to protect them from electrocution. *Id.* at 439. As the *James* court commented, "there must be evidence that the owner was aware of how the ladder, toilet, or other item was being used that created a dangerous condition." 2008 WL 2220016, at *3.

The parties agree that the accident in the case at bar occurred when the scaffold welded to the inside of Tank M-39 collapsed. Plaintiffs have offered no evidence that the absence of fall protection or the lack of "tagging" of the scaffolding proximately caused the interior scaffold to break away from the interior tank wall. Indeed, Dodson's testimony forecloses the argument that Lubrizol's failure to provide an independent lifeline was the relevant condition. According to Dodson, shortly after lunch on the day of the accident, Ashworth, Burge, and he ascended a ladder to reach the scaffold and were there only a "matter of seconds" before the collapse occurred. Dodson elaborated:

> Q:   . . . When you – you said you had just gotten up there –
> A:   Right.

Q:      – when it failed.  Were you planning on working for a long period of time without tying off, or were you just getting ready to tie off and hadn't had a chance to tie off?

A:      No, we hadn't had a chance to tie off.

Q:      Okay.  So, you had a plan to tie off once you got up there; you just hadn't been up there long enough to do is that; is that –

A:      Right.

Q:      Okay.  About how long was it that you were on the scaffold on that instant before you actually fell?

A:      I would think seconds.

Q:      Okay.

A:      I mean I had just got up there.  When I got up there, it fell.

Q:      Okay.  So, almost immediately, is that fair to say?

A:      Yes, sir.

Hence, the Pat Tank employees did not have an opportunity to tie off to an independent lifeline before the scaffold collapsed even if it had been provided.  Thus, the failure to provide such a lifeline could not have been the proximate cause of Plaintiffs' injuries.

Moreover, Dodson's testimony discounts the notion that the lack of "tagging" had any significance.  Dodson testified that, under the circumstances, there was compliance with the tagout rules for the job.  Dodson explained that the scaffold was not "tagged" or approved for use because it was not yet complete.  When asked what about it was incomplete, Dodson stated, "[w]e couldn't go all the way around the tank because there was another scaffold inside the tank." Indeed, Lubrizol's Houston Plant Safety Manual makes it clear that tagging is not required until a scaffold is complete, stating, "[f]ollowing completed scaffold erection, the contractor shall secure a scaffold tag."  The Manual also highlights the fact that it is the contractor's responsibility, not Lubrizol's, to see that a tag is obtained.  In any event, the lack of "tagging" did not cause the scaffold to collapse.

Plaintiffs' safety experts opined that the hazard that caused the scaffold to break away from the wall was the non-ground weld sites for the scaffold clips. Thus, the only arguably relevant dangerous condition advanced by Plaintiffs was the lack of ground weld sites for affixing the scaffold to the tank. Therefore, in order to prevail on the actual knowledge component, Plaintiffs must show that Lubrizol employees actually knew through physical observation, conversation with Pat Tank employees, data review, or some other means that the weld sites for the interior scaffold of Tank M-39 were not ground and also knew that the lack of grinding created a dangerous condition.

To this end, Plaintiffs allege that there were numerous Lubrizol employees on the job site who "saw and had actual knowledge" of the dangerous condition of the weld sites, including Villegas (Maintenance Engineer), Don Martens ("Martens") (Construction Foreman), Kyle Trahan ("Trahan") (Maintenance Coordinator), John Burke ("Burke") (Unit Production Foreman), and Leo Zeglin ("Zeglin") (Operator). In response, Lubrizol argues that Plaintiffs have offered evidence of only constructive knowledge and have made an insufficient showing that Lubrizol employees actually observed the interior weld sites or appreciated the danger posed by their non-ground state. Specifically, Lubrizol asserts that Plaintiffs merely present evidence that Lubrizol employees were in the proximity of, peeked into, or entered the tank on rare occasion, thus requiring further extrapolation for a finding that Lubrizol had actual knowledge that the weld sites were not ground. Lubrizol also maintains that there is no evidence that any Lubrizol employee had actual knowledge that Pat Tank's failure to grind the tank walls presented a danger.

The court concurs with Lubrizol's analysis—Plaintiffs have not produced adequate evidence from which it could be inferred that Lubrizol had actual knowledge of a dangerous

condition inside Tank M-39.  In reaching this conclusion, the court reviewed the depositions of Dodson, various Lubrizol employees including Villegas, Martens, Trahan, Zeglin, and Burke, as well as Mac Archer ("Archer"), a contract American Petroleum Institute ("API") inspector employed by Base Line Data.  Dodson testified that Villegas visited the Tank M-39 project location, stuck his head inside the tank, observed the interior tank scaffolding, and could have seen that the weld sites were not ground:

> Q: If you were there in the vicinity of the lug and you looked at a lug that had been ground – where the surface had been ground beforehand, would you be able to physically see with your eyes that there had been grinding on the outside of the tank?
> A: Yes, sir.
> Q: – in preparation for the weld?
> A: Yes, sir.
> Q: If Raul Villegas looked at that lug site – those lug sites, would he have been able to see, on October 28, 2003, that the lug sites had not been ground?
> A: Yes, sir.
> Q: And why is that?
> A: Anybody could have seen it.  I mean they –  it'd be plain as day if they were ground.
>
>                                            * * *
> Q: On the inside tank scaffold, was there any grinding of the tank material before the welding of the lugs?
> A: No.
> Q: Did Mr. Villegas see that, as well?
> A. Yes, sir.

The testimony of Dodson does not demonstrate that Villegas was actually aware both that the weld sites were not ground and that the non-ground weld sites constituted a dangerous condition; at most, it reflects his supposition that Villegas saw that the weld sites were not ground.

Plaintiffs have cited no deposition testimony from Villegas indicating that he either personally noticed that the scaffolding was welded onto non-ground sites on the inside of the tank

or that a Pat Tank employee told him about such a practice before the accident. Indeed, Villegas testified repeatedly that he never went into the tank, not even on the day of the accident or afterwards. Moreover, Plaintiffs have proffered no evidence establishing that Villegas would have comprehended the danger of such a condition.

The deposition of Villegas also reveals his lack of knowledge regarding scaffold construction, the procedures to be followed by Pat Tank at the Lubrizol site when affixing the scaffold, and the nature of the scaffolding actually erected inside Tank M-39:

Q:    Up until the time of the accident in any of your dealings with Pat Tank about M-39, did you ever inquire as to what type of scaffolding, if any, Pat Tank was going to use on the M-39 job?
A:    No.
Q:    Did you inquire as to whether they were going to use what's called tank builders scaffolding?
A:    No.
Q:    Did you inquire as to whether or not there would be any welding used in scaffolding?
A:    No.
Q:    Did you inquire as to where the locations of welds for scaffolding would be?
A:    No.
Q:    Did you inquire as to the number of welds that might be needed for scaffolding?
A:    No.
Q:    Did you inquire as to for scaffolding welds what type of welds would be made?
A:    No.

* * *

Q:    Do you know what the OSHA regulations say about scaffolding, the different types of scaffolding that can be used for certain jobs?
A:    No, sir.
Q:    Have you ever been specifically trained in that?
A:    No, sir.
Q:    Do you know whether or not tank builders scaffolding is considered a standard from of scaffolding under the OSHA scaffolding requirement or not? Do you know one way or the other?
A:    No, I don't know.

34

Q: Has anybody at Lubrizol ever given you any training, instructions or direction about possible hazards in what's called tank builders scaffolding?

A: No.

Q: Has anyone at Lubrizol management ever given you any training or direction in what to look out for, possible problems in tank builders scaffolding?

A: No, sir.

* * *

Q: Now on the M-1 – on the M-39 job up to the time of the accident, did you ever take any steps to look at the type of scaffold, if any, that Pat Tank was using?

A: No.

Q: Did you ever take any steps to inspect the scaffold?

A: No.

Q: Did you ever take any steps to try to get a scaffold tagged?

A: No.

Q: Did you ever request that Lubrizol safety department go into the tank to look at the scaffolding?

A: No.

Q: Did you ever request that anybody else at Lubrizol, any other Lubrizol employee go in and look over the scaffolding?

A: No.

Q: Do you know of anyone at Lubrizol whoever took any positive steps to try to inspect the scaffolding, up to the accident?

A: No, it's not our responsibility.

Villegas's testimony suggests that, even if he had briefly looked at the weld sites while poking his head through the manway, he was not in the position to appreciate the inadequacy of Pat Tank's welding procedures.

Plaintiffs also direct the court to the deposition testimony of Archer, a contract inspector. Plaintiffs point to a conversation between Archer and Villegas after the accident implying that both he and Villegas knew the weld sites should have been ground. Immediately preceding the question cited by Plaintiffs, however, Archer was asked about his discussions with Villegas before the accident:

Q: Before the accident in this case happened, did you ever have any discussions with Raul Villegas or anybody else at Lubrizol about whether

or not in the course of people putting tank builder's scaffold up, the walls of the Lubrizol tanks should be ground before welding scaffold clips?

A:    No.

Q:    What about after the accident, was that discussed?  Was there any dialogue or discussion between you and Mr. Villegas about that?

A:    Yes.  Some dialogue.

* * *

At deposition, Archer claimed to have been previously aware of the importance of grinding the walls of a tank before erecting scaffolding.  In fact, Archer stated that he knew that "it's part of the process to doing any weld to have a clean surface to weld to."  Further, Archer surmised that Villegas also knew this.   Nonetheless, Archer freely admitted that he had absolutely no experience or expertise regarding welding:

Q:    Are you a certified welder?

A:    No.

Q:    Do you have any kind of welder certifications?

A:    No.

Q:    Or have you had any kind of welder certifications?

A:    No.

Q:    Have you done welding in your life?

A:    No.

Q:    Have you ever attended any kind of welding course or welding school?

A:    No.

Q:    Have you ever picked up and tried to handle a welding torch?

A:    No.

Moreover, when asked about his knowledge of tank builders' scaffolding Archer responded:

Q:    Have you ever heard the term "tank builders' scaffolding"?

A:    No.

Q:    Either before or after the accident.

A:    After.

Q:    How did you hear about it afterwards?  What were you told?  What did you learn?

A:    I was told or I had learned through my own – through my own research about it.

* * *

Q: Have you ever attended any scaffold safety courses?
A: No.
Q: Have you ever held yourself out as an expert in scaffold safety?
A: No.
Q: Have you ever been certified by OSHA in scaffold safety?
A: No.
Q: Have you ever been designated as a competent person in scaffold safety?
A: No.

Hence, the court rejects the notion that, based on Archer's testimony, Villegas had actual knowledge that the tank walls were not properly prepared before the scaffolding was affixed. Furthermore, there is no evidence tending to show that either Archer or Villegas knew that Pat Tank's welds were faulty. Likewise, although Archer's testimony suggests that he was aware of the potential danger posed by collapsing scaffolds, there is no indication that he was aware of a dangerous condition presented by Pet Tank's scaffolding.

Plaintiffs also claim that Martens, a Lubrizol construction foreman, visited the tank site at least twice a day and therefore had actual knowledge that the weld sites were improperly prepared. At deposition, however, Martens stated that he had no recollection of observing the dangerous condition:

Q: Do you have any recollection of seeing whether or not the Pat Tank crew was grinding on the tank walls before welding the scaffolding clips?
A: No, sir.

Similarly, Trahan, Lubrizol's maintenance coordinator, testified that he had no knowledge of the lack of grinding of the weld sites inside the tank or the significance thereof prior to the accident:

Q: And do you know that there are what are called clips or scaffold clips that are welded to the walls of the Lubrizol tanks?
A: No. I mean I know they're welded on, but I don't know how they attach them.

***

Q: Did – do you know whether or not Pat Tank was grinding on M-39 before welding any part of the scaffold to the tank?

A: I don't know.

Q: Did you ask about that?

A: No.

Q: Did you go look to see? In other words, did you look at the weld location to see?

A: Not that I recall, no.

As with the other Lubrizol employees, Zeglin, an operator, had no recollection of the state of the tank walls:

Q: At any time on October 28th or 29th, when you made rounds and you were at M-39, did you see any sign that the exterior walls of M-39 had been ground any where the scaffold clips had been welded onto the tank wall? Did you see any kind of that, as you recall?

A: I don't recall. . . .

Plaintiffs further contend that Burke, Lubrizol's production foreman, had knowledge of the dangerous condition. They point to testimony that Burke observed Pat Tank workers on the exterior scaffolding. Burke, however, explained that he never went inside Tank M-39:

Q: Did you go into the tank?

A: No.

Q: Do you take any readings of atmosphere inside the tank?

A: At the mouth of the tank.

Q: How do you do that?

A: Stand there at it.

Q: So was the – was the manway open by that time?

A: Yes.

Q: Do you know who opened the manway?

A: No.

Q: So do you go to the manway and lean in the manway and put your meter inside?

A: We have – yes. We have a tube that attaches to it that we can stick the tube in that's drawing, you know, the contents from the inside of the vessel.

Q: Okay. So you're actually standing just outside tank – of the tank at the manway?

A: Yes.

Q:   And are you – do you have your head there at the manway where you can
see inside the tank?
A:   No. Standing to the side of it.

Thus, even if certain Lubrizol employees, who had limited experience with welding and scaffold construction, had managed to notice the non-ground areas on the interior tank wall where the scaffolding was affixed twelve feet above the ground, Plaintiffs have adduced no evidence suggesting that they would have realized this presented a danger to the Pat Tank employees working inside the tank.  Most telling, Dodson, an expert welder and long-term employee of Pat Tank, who had constructed and welded thousands of scaffolds during his tenure, did not recognize that there was a danger presented by the welding of the scaffold.  He testified that he did not think that grinding was necessary based on his visual inspection of the tank surface and his ten years of experience in the field.  He further elaborated that, even after the accident, he did not believe that the welding was faulty:

Q:   Was the weld on this occasion properly done to your knowledge?
A:   Yes, sir.
Q:   Was the weld on a properly prepared surface?
A:   I thought so.
Q:   Today do you still believe that?
A:   Yes, I still believe that.
Q:   Okay. What caused the weld to fail?
A:   I have no idea.

Hence, if Dodson, an expert in the field, was unaware of the danger, there is no reason to conclude that Lubrizol employees, with far less expertise in welding and tank builders' scaffolding, would have recognized the risk.

As a consequence, Plaintiffs have not shown that Lubrizol had actual knowledge of a dangerous condition on the premises and failed to warn others of the hazard, as required for the imposition of liability under § 95.003(2).

III.    Conclusion

Based on the above analysis, there is insufficient evidence in the record for a reasonable jury to infer that Lubrizol had the requisite control over the "means, methods, or details" of Pat Tank's work and actual knowledge of the danger or condition that caused Plaintiffs' injury. Thus, Plaintiffs Ashworth and Dodson have failed to demonstrate that they satisfy an exception to § 95.003 of the Texas Civil Practice and Remedies Code, which insulates property owners from liability for injuries to employees of independent contractors. There remain no material facts in dispute, and Lubrizol is entitled to judgment as a matter of law. Accordingly, Lubrizol's motion for summary judgment is granted, and all other pending motions are denied as moot.

SIGNED at Sherman, Texas, this 1st day of October, 2008.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE